UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**JOHN PATRICK STOKES,**                                        Case No. **09-60265-11**

                Debtor.

## *MEMORANDUM  OF  DECISION*

At Butte in said District this 21st day of September, 2009.

The following contested matters are pending in this Chapter 11 bankruptcy case:  (1) the

Debtor John Patrick Stokes' ("Stokes" or "Debtor") motion to lift stay (Docket No. 58) seeking

to proceed with his appeal of judgment in the Montana Supreme Court Case No. DA 09-0049,

but to continue the stay of execution of judgment; and (2) the Office of United States Trustee's

("UST") motion to convert this case to Chapter 7 filed on April 22, 2009 (Docket No. 24).

Stokes filed objections and a motion to dismiss the UST's motion for lack of jurisdiction, and

Stokes appeared pro se and testified at the hearing in opposition to the UST's motion which was

held after due notice at Missoula on August 13 and 14, 2009.  Debtor's motion to lift stay was

heard on July 16, 2009, and held in abeyance pending the decision on the UST's motion.  Other

witnesses testified and exhibits were admitted at the hearing on August 13 and 14, 2009, as

described in detail below.  At the conclusion of the parties' cases-in-chief the Court took the

UST's motion to convert under advisement.  After review of the record and applicable law, this

matter is ready for decision.  For the reasons set forth below the Court will enter a separate Order

overruling the Debtor's objections and granting the UST's motion, and converting this case to

Chapter 7 of the United States Bankruptcy Code.  Debtor's motion to lift the stay will be denied

1

without prejudice.

The UST was represented at the hearing on August 13 and 14, 2009, by attorney Neal G. Jensen ("Jensen") of Great Falls, and UST bankruptcy analyst/certified public accountant ("CPA") Larry Rezentes ("Rezentes") testified. Attorneys Joel E. Guthals of Billings, Robert K. Baldwin and Trent M. Gardner of Bozeman appeared representing creditors Todd Gardner and Davar Gardner (together "Gardners"), who filed a joinder to the UST's motion to convert, and Todd Gardner testified. In addition Gardners called the City Attorney of Kalispell, Montana, Charles Harball ("Harball") to testify.

The Montana Department of Revenue ("DOR") filed a joinder to the UST's motion to convert (Docket No. 38) and was represented by assistant attorney Keith A. Jones, and DOR's bankruptcy specialist Kim Davis ("Davis") testified. The United States of America, Internal Revenue Service ("IRS") filed a joinder (Docket No. 42) to the UST's motion, but did not appear. Creditors Thomas H. Boone, trustee of Boone Karlberg Employees Profit Sharing Trust, William E. Mytty, Sandra F. Mytty, Quality Supply, Inc. Profit Sharing Plan and Trust, Douglas S. Hadnot, J. Chriss Crawford, Myrna K. Crawford and Stephen S. Ellis, M.D., P.C. Employees Amended and Restated Pension Plan (together "Boone, et al.") filed a joinder to the UST's motion (Docket No. 33) and were represented by attorney Robert J. Sullivan of Missoula. Exhibits ("Ex.") 9, 17, 18, 19, 21, 22, 23, 24, 25 and 26 offered by the UST, and Gardners' Ex. 2, 3, and 11, were admitted into evidence at the hearing.

Although the Debtor argues that this Court lacks jurisdiction to convert this case to Chapter 7, under 28 U.S.C. 1334(a) this Court has original and exclusive jurisdiction in this bankruptcy case, and the Bankruptcy Code authorizes conversion of a Chapter 11 case to a case

2

under Chapter 7 under 11 U.S.C. § 1112(b) if cause is shown and if conversion is in the best interests of creditors, and if the debtor fails to establish that there is a reasonable likelihood that a plan will be confirmed within applicable timeframes and that the acts or omissions of the debtor were not reasonably justified and will be cured within a reasonable period of time. The UST's motion to convert the case to Chapter 7 is a core proceeding under 28 U.S.C. § 157(b)(2). Debtor's motion to lift the stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

## FACTS

John Stokes moved to Montana in 1994 and became a resident, but he testified at his § 341(a) meeting of creditors that he had never filed an income tax return for the State of Montana and that he has not filed a federal income tax return since 1985. Ex. 2, Transcript ("Tr."), pp. 82, 83. At the hearing on August 13, 2009, Stokes testified that he calls the IRS "every year" and "they say I don't owe any taxes."

Stokes lives in a house on 80 acres at 12887 Raven Way in Bigfork, Montana. In 1994 he mortgaged the property to HSBC. 341 Tr., p. 28. Stokes owned that property until he transferred the house and 80 acres in 1998 to his daughter Elizabeth Stokes-Pickavance ("Elizabeth"), who paid him no money for the property. Stokes kept a life estate and pays his daughter no rent, but pays the mortgage and expenses. Ex. 2, pp. 27, 28, 167, 169.

In April 2000 Stokes signed a promissory note in the amount of $665,000. Stokes testified that note was assigned to creditors Boone, et al. Stokes admitted that he failed to make payments on that note. Foreclosure proceedings were commenced, and Stokes counterclaimed alleging usury. A settlement was reached between Stokes and Boone, et al. on April 24, 2006.

3

Stokes testified that under that settlement he released his usury claims, and a balloon payment was due on April 24, 2009. That balloon payment was not made and interest continues to accrue on that debt at the rate of $9,000 per month. Stokes testified that the balloon payment has grown to $1.1 million but that he has assets to pay it.

Stokes owns and operates KGEZ, an AM radio station in Kalispell, Montana, under license from the United States of America, Federal Communications Commission ("FCC"). He testified that KGEZ is the oldest continuously operating AM station in America. The station sits on 6.5 acres at 2995 Highway 93 South, and Stokes owns additional real property nearby on which are located KGEZ's radio towers. Stokes testified that a corporation owned by him purchased KGEZ and its property in April 2000, but that his secretary failed to keep the corporation registered with the State of Montana and it was dissolved[1], leaving Stokes as the sole successor and owner.

Stokes had his corporation which owned KGEZ sign a promissory note in the amount of $985,000, and gave Stokes a second mortgage. In 2002 Stokes assigned that mortgage to his daughter Elizabeth. Nothing was ever recorded regarding that assignment, and the public record still shows the property is in Stokes' name. In Ex. 9, Stokes' responses to Gardner's discovery requests dated February 25, 2008, Stokes identified his assets in response to Interrogatory No. 14 on page 10 as a "2nd Mortgage – 160 acre easement" which he acquired on January 2001, the value of which and Stokes' equity of which are stated as $2,800,000. Stokes testified that he answered those interrogatories in a hurry and was sanctioned for his responses. He testified that

---

[1]After the dissolution, he testified, his corporation's name was registered by the Montana Human Rights Network.

4

he owed the second mortgage to his daughter, and that he transferred the easement to her six years earlier.

Stokes testified that KGEZ grosses about $7,000 or $8,000 per month, and that it just about breaks even after the bills are paid. He testified that he does not need much. However, Stokes answered "No" at his § 341 meeting when asked whether the radio station ever made money. Ex. 2, 341 Tr., p. 183. At the hearing Stokes was impeached when he answered "No" when asked if it was true that the radio station has never made money. When asked whether he lived off of donations from his audience Stokes answered "No" at the hearing, but at a hearing held on October 12, 2007, in Cause No. DV-01-023(c) in the Montana Eleventh Judicial District Court, Flathead County, Stokes testified that he, his wife and his daughter work for free and live on donations from his audience. Ex. 11, p. 13.

KGEZ's towers are located on 47 acres of land near the Kalispell City Airport. Harball is the Kalispell City Attorney. He testified that the FAA has found that the KGEZ radio towers are a hazard to aviation, that the towers extend 150 feet into the necessary airspace[2] of the airport, and that the FAA has specifically advised Kalispell how to proceed to remove the hazard to aviation.

Stokes testified that the City of Kalispell voted to condemn his radio station property. The Kalispell City Council met and passed a resolution with the mayor dated December 15, 2008, Ex. 3, acknowledging the hazard to aviation posed by the KGEZ towers and the need to remove and/or relocate the towers. Ex. 3. Ex. 3 resolves at page 2, Section 1, to direct the city

---

[2]Stokes and Harball argued about whether the KGEZ towers were put up illegally 50 years ago, which is irrelevant to the pending matter.

manager to advise the city counsel of the projected costs of relocating the KGEZ towers, after which the City Council will decide whether or not to make a formal offer to the owner of the KGEZ towers.  Section II of Ex. 3 provides that if a formal offer is made and rejected, the City Council will determine whether or not it will commence condemnation action against the towers. Harball testified that the City has not yet decided to expand its airport, has not decided to make an offer to Stokes for the towers, and has not yet begun condemnation proceedings against the KGEZ towers, but that if the City wants to use FAA funds to expand its airport it must mitigate the towers.

Harball explained that it not necessary for Kalispell to acquire or condemn the KGEZ land under the towers, but rather it needs only lower the KGEZ towers below the necessary airspace or relocate them[3] to eliminate the hazard to aviation.  Harball testified that Kalispell does not have $1 million available for Stokes' property.  Under cross examination by Stokes, Harball acknowledged that the City has purchased two parcels of property near the airport, and that if the City decides to acquire the KGEZ towers it will make Stokes an offer.

The Gardners sued Stokes' corporation in state court and obtained a default judgment against the dissolved corporation in the amount of $180,000.  Stokes testified that several months later Gardners won a slander judgment in the amount of $3.9 million, but that he was not allowed to examine witnesses.  The trial of Gardners' action against Stokes' corporation was held in September of 2008.  Stokes admitted that the trial was by jury and he was represented by counsel, who put on witnesses, offered exhibits and cross examined Gardners' witnesses, and made a

_____

[3]Harball explained that the radio towers need only be within sight of the radio station to operate.

6

closing argument.  After the jury deliberated[4] it entered judgment against Stokes in favor of Gardners including a compensatory award in the sum of $1.8 million and, after a proceeding involving a request for punitive damages, the jury awarded Gardners another $2 million.

Stokes went to see attorney Gregory W. Duncan ("Duncan") about filing a bankruptcy petition.  Stokes testified that his secretary filled out a worksheet of his liabilities, Ex. 21.  Ex. 21 includes claims for back taxes owed by the corporation Z-600 Inc. to the IRS in the estimated amount of $18,117.04, and a claim owed to the Montana Dept. of Labor & Industry by Z-600 Inc. in the amount of $3,356.36.

**Stokes' Chapter 11 Filing.**

Stokes filed his voluntary Chapter 11 petition on March 4, 2009, and filed an amended petition signed by Stokes on the same date.  He testified that the only reason he filed a bankruptcy petition is because of the Gardners' $4 million judgment against him.  Stokes listed his address on the petition as 12887 Raven Way in Bigfork.  He listed two dba's, Skyline Broadcasters, Inc., and Z-600, Inc.  Rezentes testified that Stokes' stated reasons for filing his petition were a $3.8 million judgment against him, and a condemnation case.  Stokes testified that the only reason he is in bankruptcy is to overturn the $3.8 million dollar judgment against him by appeal.

Originally Stokes was represented in this case by Duncan, who prepared the Debtor's original petition, Schedules and Statement of Financial Affairs ("SOFA"), and prepared Debtor's amended Schedules and SOFA.  Duncan filed a motion to withdraw as Debtor's counsel on June 5, 2009, which was granted after a hearing held on June 18, 2009, and thereafter the Debtor has

---

[4]Stokes testified that alleged jury tampering occurred.

appeared pro se.

On July 13, 2009, Stokes filed complaints against Gardners, Questa and Boone, et al., and attorney Wade DaHood ("DaHood") and DaHood's law firm that represented him in the condemnation case. Stokes' complaint against Gardners in Cause No. DV-09-896A, Ex. 17, alleges claims based on RICO and alleges that Gardners obtained their judgment by perjury, and for damages to his KGEZ towers. Ex. 17 does not total Stokes' damage requests, but the thirteen counts request damages against Gardners in amounts of several tens of millions of dollars, and in addition count one prays to void Gardners' $3.8 million judgment against Stokes, which Stokes testified is the same judgment he has appealed to the Montana Supreme Court which is pending. Todd Gardner testified that Gardners have prior judgments against Stokes, which he did not pay except for minor amounts from Stokes' accounts against which Gardners levied in execution.

Stokes' complaint against DaHood in Cause No. DV-09-897C states claims for relief based on embezzlement and extortion. Ex. 18. Stokes filed a complaint against Questa and Boone, et al., in Cause No. DV-09-898B on July 13, 2009, alleging usury and settlement made in bad faith, seeking $2.7 million in damages and other relief. Ex. 19.

**Debtor's Original Schedules.**

The Schedules and SOFA were not filed with the petition, and the Clerk sent Debtor a deficiency notice on March 5, 2009, alerting the Debtor of the deficiencies. Debtor asked for and received an extension to file his Schedules and SOFA, and filed his initial Schedules and SOFA on April 3, 2009. Ex. 24. Stokes testified that his attorney prepared his original Schedules and SOFA in a rush, and that as a result they were "horrible" and "wrong." Under cross examination Stokes testified that he never reviewed his original Schedules, and that he received the last page

of the Schedules and SOFA by facsimile and was asked to sign the last page without reviewing them, which he did.

Ex. 24 includes the original Schedules and SOFA. Schedule A lists real property consisting of the Debtor's residence at 12887 Raven Way in Bigfork, valued at $1.3 million, and 6 acres of real property at 2995 Highway 93 South in Kalispell where KGEZ is located, valued at $1.8 million. Stokes did not list his daughter Elizabeth's interest in his residence on his original Schedules, or list her as a codebtor.

Schedule B lists $148,042.16 in personal property. Schedule B does not include any interest in the FCC broadcast license for KGEZ, and neither does Schedule B include the broadcast towers for KGEZ. Also not included on Schedule B was the $2,800,000 asset he disclosed on page 10 of Ex. 9, described as a second mortgage on a 160 acre easement. Stokes testified that his Schedule B failed to list a sixty inch television which he included in his amendments.

At item 8 of Schedule B, "Firearms and sports, photographic, and other hobby equipment", Stokes listed a 12 gauge shotgun valued at $100 and fishing gear valued at $300. This entry was amended substantially. Stokes testified that the original values were a typographical error. Item 19 of Schedule B, "Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A – Real Property" is marked "None", which Stokes later amended.

Item 21 of Schedule B ("Other contingent and unliquidated claims of every nature ...") is marked "None." Stokes testified that his entry at Item 21 was an omission on his part, including his omissions of claims totaling approximately $10 million. Five suits involving Stokes are

9

listed below in the SOFA at paragraph number 4.  Stokes testified that he does not know the reason the claims were omitted from Item 21.

At Item 23 ("Licenses") of Schedule B Stokes listed "None", which he later amended on Ex. 25 to add an "FCC License for Radion [sic] KGEZ" as jointly owned with a value of $1,500,000.  On Ex. 9, p. 11, in response to Gardners' Interrogatory No. 15 Stokes responded "This License belongs to the FCC."  Stokes testified that his discovery response is a factual statement and that his inclusion of the license on Schedule B at a value of $1.5 million "must have been an oversight."

Item 25 of Schedule B ("Automobiles, trucks, ...") lists a single 2002 Dodge 1500 pickup valued at $2,075.  Schedule B at item 26 ("Boats, motors, and accessories") is marked "None."  Rezentes testified that the Debtor owns a watercraft which was missing from the Schedules.  Ex. 24.  Item 28 ("Office equipment, furnishings and supplies") of Schedule B lists $66,000 with the explanation "See Attached List."  The attached list at the end of Ex. 24 is a statement titled "Income by Customer Summary" which Stokes testified was included by mistake, and that there was no attached list for Item 28.  Item 29 ("Machinery, fixtures, equipment, and supplies used in business") is marked "None."  The total value of personal property listed on Schedule B is $148,042.16.

Schedule D of Ex. 24 lists three creditors holding secured claims, including a $248,585.26 claim secured by a mortgage on a home loan from HSBC Mortgage Services, and a $1.3 million secured loan of Questa Resources secured by KGEZ and "residence property," UCC and mortgages, with a balloon payment due in May 2009.  Stokes listed the value of Questa's collateral on Schedule D as $1.8 million.  Stokes testified that he has not paid Questa because he

is tied up in this case, and he admits that interest continues to accrue on Questa's claim at the rate of $9,000 per month at twelve percent.  Ex. 2, Tr., pp. 106-07.  Stokes did not list the assignment to his daughter of the mortgage on KGEZ on Schedule D.  He testified that he forgot about the assignment until after his § 341 meeting.

Stokes checked the box on Schedule E stating he has no creditors holding unsecured priority claims.  Stokes testified that was not true, and that he assumes that he owes taxes. Ex. 2, p. 81.  Stokes thought that priority creditors are those with superior loans.

Schedule F of Debtor's original Schedules list unsecured nonpriority claims in the total amount of $57,425.17, and failed to list the $3.8 million judgment which had been entered against Stokes in favor of Gardner, which he described as the only reason he filed for bankruptcy. Ex. 24.  Stokes testified that the Gardners' judgment was admitted.

The SOFA, at item 4 ("Suits and administrative proceedings, executions, garnishments and attachments") listed five civil lawsuits in the Montana Eleventh Judicial District Court for Flathead County, including an action by Gardners against Stokes in Case No. DV-07-729; a foreclosure action by William E. Mytty et al. against Stokes; an action by the "MDDT" against Stokes; and an action by "Poeshel" against Stokes.

Schedules I and J and SOFA list Debtor's income as a $6,000 monthly draw.  Ex. 24. Rezentes testified that the Schedules and SOFA show that the Debtor just about breaks even from his business, and has no ability to pay his debt obligations.

The original Schedules and SOFA were signed by Stokes under penalty of perjury.  At the hearing Stokes testified that he freely admits that his original Schedules were wrong.  Ex. 24 includes Stokes' declarations, under penalty of perjury, that he had read the Schedules and SOFA

11

and that they are true and correct to the best of his knowledge, information, and belief.  Stokes testified that signing them was a "very bad mistake" on his part.  Later Stokes testified:  "I never reviewed the original Schedules" and that "I was asked to sign the last page".

**Section 341(a) Meeting of Creditors.**

The § 341(a) meeting of creditors was scheduled for April 10, 2009.  The UST sent the Debtor a letter outlining his obligations under Chapter 11, and that nonfulfillment of the obligations may result in the UST filing a motion to convert to Chapter 7.  Stokes appeared at the § 341 meeting and was examined by the UST and others.

At page 9 of the Transcript of the § 341 meeting, Ex. 2, Stokes was asked if he had an opportunity to review his Schedules and SOFA carefully to ensure they were accurate, and he answered "Yes."  He was asked if at the time he signed his Schedules under penalty of perjury if he understood them to be true and accurate, and he again answered "Yes."

Stokes answered "Right" when asked if KGEZ "was running at a wash."  He testified that his statement that he took a $6,000 monthly draw is not accurate and his average net monthly income is closer to $0.  Ex. 2, p. 103.

Stokes testified at the § 341 meeting that he put no value on his life estate in 12887 Raven Way.  Tr., p. 170.  He testified that he did not mention at the § 341 meeting the $2.5 million which he claims he owes to his daughter.  At page 97 of Ex. 2, Line 14, when asked if there were any other creditor that he owes money to for any reason, Stokes answered "No" and that he went through his schedules "very well together."  After the § 341 meeting, Stokes testified that he remembered that his daughter had a claim against him.

Stokes testified at the 341 meeting that he owes 5 years or so of federal employees' taxes

for payroll liability, and owes $3,000 to the Montana Department of Labor and Industry for unemployment insurance contributions from 2001 through 2004. Ex. 2, pp. 88, 89. He testified that he has never filed tax returns for the State of Montana. He was asked at the § 341 meeting about his 2008 tax returns and he answered that Jensen told him to redo all his tax returns as individual since his corporation was dissolved. Stokes testified that he owes 2 years worth of property taxes on his house, approximately $7,000, and that he owes $21,000 in property taxes on the radio station. Ex. 2, pp. 94-96.

Rezentes testified that he attended the 341 meeting and discussed with the Debtor the administrative and compliance requirements for a chapter 11 case, the facts of the case and the Debtor's plan for reorganization, and that the Debtor stated he received the UST's letter. Stokes admitted that he was asked at the § 341 meeting whether he was aware of the requirements to pay quarterly fees and file monthly operating reports.

Stokes testified that he was asked at the § 341 meeting whether he went through the Schedules and whether they were true and accurate, and he answered yes. Stokes admitted that there were a lot of typographical errors and that at least one asset was not included in his Schedules. Stokes agreed at the § 341 meeting to amend his Schedules to correct errors within ten days, but he testified at the hearing that he did not correct within 10 days. At the § 341 meeting Jensen asked Stokes whether he understood that he had "one more shot to make your schedules and statements absolutely accurate, every line," and Stokes answered that he understood. Ex. 2, p. 67. Jensen advised Stokes that he would again have to sign the declaration under penalty of perjury that everything on the amended schedules is true and correct, and Stokes answered "Yes" that he understood. Ex. 2, p. 67.

13

Rezentes testified that he understood from the § 341 meeting that the Debtor was going to establish a debtor-in-possession ("DIP") account at Wells Fargo. He testified that he reviewed with Stokes in detail the format for monthly operating reports required by the UST, and that he told Stokes that the monthly reports were due by the fifteenth day of the following month.

Rezentes explained that the purpose of the monthly operating reports for Chapter 11 debtors is to allow the UST to assess whether a debtor's operations are self sustaining, to see if debt is being incurred without court authorization, to see if a proper DIP bank account is established and to verify that insurance is maintained on property. Rezentes testified that he later told both the Debtor and his attorney Duncan over the phone that the first monthly operating report was due by April 15, 2009, for March 2009, but that the UST extended the due date to April 30. When asked whether the Debtor filed his monthly operating reports for March, April, May or June on time Rezentes answered "No." Rezentes testified that the bank statements for the months of March through June of 2009 have not been submitted by the Debtor, and that he is missing a number of forms which would allow the UST to monitor Debtor's case.

Stokes asked Rezentes about the profit and loss ("P&L") statements which the Debtor did deliver to the UST. Rezentes answered that the P&L statements which Debtor delivered were on his radio station, that some statements on the P&Ls are made on a cash basis and others are made on an accrual basis. Rezentes testified that the Debtor was made aware of the requirement for paying UST quarterly fees, and that failure to pay the fees could result in dismissal or conversion of the case to Chapter 7. Ex. 2, pp. 5-6.

Kim Davis of the DOR testified that the DOR's only contact with Stokes was at the § 341 meeting, and that he never provided the DOR with his Quickbooks data like he said he would.

14

She testified that, based on Stokes' § 341 testimony, there are taxes and penalties owing to the DOR.

**Debtor's Amended Schedules/Ex. 25.**

Stokes filed amended Schedules and SOFA, Ex. 25, on July 24, 2009, although the date of Stokes' signatures on Ex. 25 is May 29, 2009. Stokes testified that the amended Schedules sat on his desk and that "I did the best I could" in preparing the amended Schedules. The amended Schedules continue to reflect serious errors and omissions.

Also on July 24, 2009, Stokes filed additional documents including P&L statements, and filed a combined disclosure statement and plan (Docket No. 73). Rezentes testified that those documents did not comply with the UST's monthly operating report format. He testified that UST Form 11 specifies the required information which the debtor must provide under penalty of perjury, but that the Debtor failed to file UST Form 11 or Form 18, and failed to provide copies of bank statements to the UST so they could verify the Debtor's representations with respect to money coming in and going out. Rezentes testified that, from the documents filed by the Debtor, the UST did not know whether Stokes set up a DIP account, whether any such account is in a safe and insured institution, whether the property was insured and whether the Debtor's statements are made under oath.

Debtor's amended Schedule A lists a total of $10,700,000 in interests in real property, versus $3,100,000 on the original. Ex. 25. The amended Schedule A omits Debtor's interest in his Raven Way residence in Bigfork, which was listed on the original Schedule A at a value of $1,300,000, but his life estate in Raven Way was added to Schedule B at Item 19 with a value listed as both "Value Unknown" and $0.00.

15

Schedule B, item 4, was amended to add a 60 inch TV.  Item 8 was amended to include more than $60,000 worth of additional firearms, fishing gear, guitars, and an observatory.  When asked under direct examination why these items were not on the original Schedule B Stokes responded that they were omitted.

Stokes testified that Rezentes told him to list his lawsuits in his amended Schedules.  Item 21 of amended Schedule B, where "None" was marked originally, lists seven claims or lawsuits, including a claim against Donna "Poeschel" and Peter "Porschel" listed with a value of $1,200,000, Case No. DV–07-246; a claim against the Montana Department of Transportation ("MDOT") valued at $0, Case No. DA 07-0281; a claim against Gardners and others for fraudulently obtaining a default judgment, valued at $12,000,000; potential claims against Farmers Union Insurance, against HSBC for usury[5]; against the City of Kalispell based on its condemnation of Stokes' property to expand the airport[6]; against Stokes' attorneys Dahood and Ben Everett for embezzlement and other claims estimated at $410,000; and against "Judge Steward Stadler" to void the default judgment and return 120 acres of easement[7].

Stokes testified that he has no idea why his claim against the Poeschels and Gardners was omitted from his original Schedule B.  Stokes' complaint against Gardners in Cause No. DV-09-

[5]Stokes' usury lawsuit against HSBC is based on the fact that HSBC has a mortgage against his residence on Raven Way.  He agreed that he is obligated to HSBC although he only has a life estate in Raven Way.

[6]The value of the claim against Kalispell listed on amended Schedule B is $0.00.  Stokes testified that he hopes to receive fair market value of the condemned property, and that he was not paid a related contract worth $40,000.

[7]Stokes testified that Judge Stadler rewrote a contract and cost Stokes $11 million, and deprived him of his constitutional right to a fair trial.

16

896A was admitted as Ex. 17.  It was drafted by Stokes pro se and includes thirteen counts and a prayer for several tens of million dollars in damages, including a RICO claim.  Stokes testified that the difference between the $12 million value on amended Schedule B for the suit against Gardners and the larger amounts requested in Ex. 17 is because he did not review it closely enough.

Ex. 19 is Stokes' complaint filed against Questa and several of the Boone, et al. creditors in Cause No. DV-09-898B alleging usury and a settlement made in bad faith, and praying for a total of $2,700,000 in damages and other relief.  Stokes filed Ex. 19 in state court on July 13, 2009, but testified that he has not yet served it.  He testified that the claim against Questa on Ex. 19 is not listed on his amended Schedules, and explained that he discovered the claim after the § 341 meeting, that he was not sure that he would proceed with that lawsuit, and has not yet served it on the defendants.

Stokes testified that he plans to file a lawsuit against Judge Katherine Curtis of the Montana Thirteenth Judicial District Court based on a violation of his constitutional right to a fair trial.  He testified that he would combine his lawsuit against Judge Curtis with his suit against Judge Stadler[8].  No claim against Judge Curtis is listed in Debtor's amended Schedules or SOFA, which Stokes testified was an omission.

Item 24 of amended Schedule B lists several additional motor vehicles, trailers, an RV 3 snowmobiles, an ATV and two 3-wheelers.  Stokes admitted that he omitted a number of vehicles from his original Schedules, and the vehicles listed at Item 24 now total $40,663.

---

[8]Stokes' claim against Judge Stadler is based on Stadler's conduct involving the easement.  Stokes admitted that the Montana Supreme Court affirmed Judge Stadler's decision.

Item 26 of amended Schedule B lists a boat valued at $6,000, solely owned by Stokes, and additional motor vehicles where in his original Schedule B he marked "None."

Item 28 of amended Schedule B now totals $76,000.00, up from $66,000 in the original, with the difference comprised of $10,000 worth of desks and computer equipment. Item 28 continues to say "See Attached List" but there is no such list attached to the amended Schedules. Item 29 of amended Schedule B lists $9,000 for two transmitters and electronics, where in the original Schedule B Stokes listed "None." The total value of personal property listed on amended Schedule B, Ex. 25, was increased to $15,467,631.38 from the $148,042.16 which Stokes listed on Ex. 24, Schedule B.

Amended Schedule D lists several additional creditors with secured claims, including creditors with claims assigned from Questa. The largest added secured creditor listed in on Schedule D is Stokes' daughter Elizabeth, who Stokes testified has a fully secured claim stated in the amount of $2,314,750 secured by Stokes' radio station property and easement. Stokes testified that her daughter has a second mortgage, that she pledged her home as security and cosigned the loan from Questa in order for Stokes to purchase the radio station. He testified that he calculated her $2,314,750 claim amount based on the interest rate. He testified that his daughter's omission from his original Schedule D was an oversight.

HSBC's secured claim on amended Schedule D is still listed as 12886 Raven Way, although that residence was deleted from the amended Schedule A. The value of HSBC's security is listed on amended Schedule A as $2,314,750, compared with $1,300,000 on his original Schedule A and D. Stokes testified that the difference must have been a "typo."

Stokes amended Schedule E to add property taxes owed to Flathead County, and the IRS

18

with an estimated amount due in the sum of $57,173.50 for back taxes owed from 2003 through 2009. Stokes did not add the DOR to amended Schedule E[9].

Amended Schedule F lists the Gardners' judgment in the amount of $3,800,000. Ex. 25. To the extent Gardners' judgment is oversecured their claim is accruing interest at the rate of $1,000 per day, although Stokes testified that their judgment has not been affirmed on appeal and that he will prevail. Amended Schedule I increased Stokes' monthly income from operation of his business to $7,202.

Stokes signed his amended Schedules, Ex. 25, like the originals, under penalty of perjury. When asked about the omissions of assets from his amended Schedules, Stokes answered that he did not check them before signing. When asked if he fully reviewed his amended Schedules Stokes testified that he apparently did not review them closely enough, and that they were prepared by Duncan.

On cross examination Stokes admitted that his Schedules, after amendment, fail to list an obligation he owes to the MDOT. Stokes testified that he will pay that debt with $146,000 which is in DaHood's possession, and is why he sued DaHood.

**Other Filings.**

The UST filed its motion to convert to Chapter 7 on April 22, 2009. Rezentes testified that the Debtor's failure to list the $3.8 million Gardners' judgment against him in his original Schedules, and Debtor's failure to file monthly operating reports, were the main reasons the UST filed the motion to convert. Joinders to the UST's motion to convert were filed by Gardners

---

[9]The DOR filed Proof of Claim No. 7 on August 20, 2009, asserting a total claim for taxes in the amount of $147,546.63, which the attachment states is estimated for years 2000-2008 for Stokes' failure to file original returns.

19

(Docket No. 26), the DOR (Docket No. 35), the IRS (Docket No. 42), and Boone, et al.

Stokes filed objections, and filed a combined plan and disclosure statement on July 24, 2009.  Ex. 26.  Under cross examination Stokes admitted that he cannot find in his disclosure statement any description of events leading up to his Chapter 11 case, and that his disclosure statement does not provide any financial information of the Debtor or historical financial data for KGEZ, does not provide a liquidation analysis, does not describe what information or sources he used to prepare the disclosure statement, does not provide any information of the present or future management of the Debtor, and does not provide any estimate of administrative expenses for this case.  Stokes testified that he obtained the form he used for the disclosure statement and plan from a bankruptcy court site.

Stokes testified that his plan depends on reversing the Gardners' $3.8 million judgment on appeal, plus getting enough from Kalispell and the FAA in his condemnation case to pay creditors in full, including Boone, et al.  Later, Stokes testified that he has assets to pay the Gardners' judgment even if it is affirmed.

Debtor's plan provides at article IV that all creditors, both secured and unsecured, will be pay in full upon Kalispell condemning the assets of KGEZ.  He testified that the only reason he is in Chapter 11 is to proceed with his appeal and overturn Gardners' $3.8 million judgment.  Stokes believes that he can pay creditors by refinancing.  He testified that he could probably sell his radio station now, and he has had offers and turned them all down.  Stokes testified that his plan proposes to pay his creditors first, and that he can relocate his transmission towers under a relocation program of the FAA.

With respect to the Debtor's combined plan and disclosure statement, Rezentes testified

20

that the plan is speculative on the outcome of Debtor's litigation and the FCC, that its allegations regarding Debtor's attorney are unsubstantiated and the UST cannot rely on it.  He testified that the plan does not designate classes of claims or provide for treatment of any claims, that it does not commit any of the Debtor's earnings for a period to repay debts, that it has no plan term, that it does not provide for acceptance or rejection of executory contracts, that it does not settle or adjust claims or provide for the rights of secured claims or general unsecured creditors, and that it does not provide for the sale of assets.  The only means of implementation of the plan is speculation that the Debtor will prevail on his appeal of the Gardner judgment, and proceeds from the condemnation case.

Rezentes testified that the Debtor is not current in payment of quarterly UST fees.  The second quarter fees were due after the end of July 2009 in the amount of $325, and Rezentes testified that the Debtor has not paid.  Under cross examination by Stokes regarding the quarterly fees, when asked if the fees had been paid, Rezentes testified that his last information was that the Debtor has not made payments of the quarterly UST fees, to which the Debtor replied that the fees were en route.

The Debtor asked Rezentes whether it appears from his documentation that his bills are being paid, and Rezentes answered that because several forms required in the monthly operating reports have not been submitted, he does not have enough information to confirm that bills are being paid.

Rezentes admitted that he has never analyzed a radio or television station for bankruptcy purposes.  When asked by the Debtor if he was familiar with FCC Rule 310d which purportedly forbids the transfer of an FCC license, Rezentes answered no.  Rezentes testified that he has not

applied to the FCC for approval of conversion of the case to Chapter 7.  Stokes testified that he

knows FCC rules and that they forbid transfers of FCC licenses without prior written approval,

and the UST has not obtained that approval.

Davis of the DOR testified that its only contact with Stokes was at his § 341 meeting, and

that since then the DOR received his tax returns for the years 2000 forward, but not for 2008.

Under cross examination by counsel for the DOR about his 2008 tax returns Stokes testified that

their completion is "imminent."  Davis testified that Stokes failed to deliver his Quickbooks data

to the DOR like he said he would at the § 341 meeting.  Stokes testified that his failure to provide

his Quickbooks backup data to the DOR as he promised was because he had to redo his tax

returns from corporate to individual at Jensen's request.  DOR again requested Stokes provide

the DOR with his Quickbooks record and he said that he would within a week.

Stokes moved for relief from the stay on June 25, 2009 (Docket No. 58), but to continue

the stay of execution in order that he can proceed with his appeal of the Gardners' judgment in

Case No. DA 09-0049 in the Montana Supreme Court.  Gardners objected and asked that a

decision on the motion be deferred until a trustee in chapter 7 has an opportunity to review the

judgment, findings of fact and conclusions of law.  After a hearing on July 16, 2009, the Court

entered an Order (docket No. 67) holding its decision on the motion to lift stay until the UST's

motion to convert is heard.

Stokes testified that his real estate taxes remain delinquent, but that his bills are being

paid.  He testified that he could sell his 6.5 acres for $1.5 million and move his studio, or he

could sell everything he owns for $10.7 million and pay off all his creditors.

22

## CONTENTIONS OF THE PARTIES

The UST moved to convert the case to Chapter 7 because of the numerous errors and omissions in Stokes Schedules, which Stokes declared that he reviewed and were accurate under penalty of perjury, and based on Stokes' failure to satisfy his burden under § 1112(b)(1) to show that the requested conversion is not in the best interests of creditors and the estate. The UST argues that cause exists to convert the case to Chapter 7, and that it is in the creditors' best interests to have a trustee appointed in Chapter 7 to investigate the nature, extent and value of the Debtor's assets. The UST's supplement argues that the Debtor has not filed any monthly operating reports and did not file amended Schedules[10] and SOFA correcting the deficiencies in the originals.

Gardners joined the UST's motion to convert, and added that conversion to Chapter 7 is in the creditors' best interests because Stokes stated that his radio station has never made any money and there is no realistic possibility of a reorganization. Todd Gardner testified that they prefer conversion to Chapter 7 because it is the only way they will get paid. In a supplemental brief Gardners argued that the Debtor's plan is a litigation plan, not a reorganization plan, and does not propose any payments to creditors. Boone, et al. file a joinder to the UST's motion for the same reasons as Gardners.

The DOR filed joinder motions and memoranda arguing that Stokes still has not filed his 2008 Montana tax return, that Stokes failed to file monthly reports as required by 11 U.S.C. § 1106(a)(1), § 1107(a), § 704(a)(8) and the UST Chapter 11 Guidelines, and that Stokes failed to timely amend and cure the failures. The IRS filed a joinder to the UST's motion to convert on

---

[10]Stokes filed his amended Schedules after the UST filed the supplement.

23

the grounds that Debtor cannot obtain a confirmable plan without updating many years of corporate and personal tax returns.

Stokes objected to the UST's motion, both while represented by counsel and pro se. Duncan argued that conversion is not in the best interests of all creditors because they will not all be paid in a Chapter 7. Stokes objected and moved to dismiss the UST's motion on the grounds the Court lacks jurisdiction because FCC rules forbid transfer of a radio station license without prior written approval which the UST has not obtained.

Stokes' pro se objection blames his attorney for the misfiling of Schedules. He argues that only the Gardners' judgment against him made him bankrupt, and that the UST's only argument for conversion is that his bankruptcy forms were not filled out right. Stokes wants the stay lifted so he can proceed with his appeal of Gardners' default judgment against his dissolved corporation in the Montana Supreme Court, where he is confident that he will prevail. He argues that in addition will prevail on his other litigation against DaHood, Poeschel, and in the condemnation case. Stokes testified that he can work out his dispute with Questa or get refinancing[11], or pay it out of his assets. Stokes argued that conversion will not serve anyone's interests, that KGEZ will go dark and that conversion will result in several years of delay. Stokes' objection states he prefers that his bankruptcy be terminated rather than converted to Chapter 7. Stokes' daughter Elizabeth filed an objection to conversion on the grounds that a sale of Debtor's assets in Chapter 7 will not obtain full market value because of lis pendens in other litigation. She argues that the parties can be paid 100% through the condemnation case, and she would appeal a conversion to protect her own assets.

---

[11]When asked where he would get refinancing Stokes answered: "I'll find it."

## DISCUSSION

The Court begins by noting that Stokes is representing himself pro se.  In such circumstance courts have a duty to construe pro se pleadings liberally.  *Bernhardt v. Los Angeles County*, 339 F.3d 920, 925 (9th Cir. 2003).  On the other hand, in the Ninth Circuit pro se litigants are not excused from compliance with the rules.  *Warrick v. Birdsell*, 278 B.R. 182, 187 (9th Cir. BAP 2002); *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987)("Pro se litigants must follow the same rules of procedure that govern other litigants.").

### I.  Jurisdiction.

Regarding Stokes' contention that this Court lacks jurisdiction because the FCC license may not be transferred, a court in *Matter of Smith*, 94 B.R. 220, 221 (Bankr. M.D. Ga. 1988) stated:

> Federal law prohibits the transfer of an FCC license or any of the rights thereunder unless application for the transfer is made to or granted by the FCC.  An exception to this rule has been made in the case of bankruptcy trustees, however, in order to avoid a conflict between the Bankruptcy Code and FCC regulations.  Thus, "[i]n cases of bankruptcy . . ., the Commission usually gives its consent to the temporary acquisition of the license by the trustee . . ., pending disposition of estate assets."  *In re Merkley*, 94 F.C.C.2d 829 (1983); *see also LaRose v. FCC*, 494 F.2d 1145 (D.C. Cir. 1974) (the Commission's regular practice is to approve an involuntary assignment of the license to a [trustee] in bankruptcy, who must then find a qualified purchaser).

In *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp.2d 481 (S.D. N.Y. 2008), the court noted that the FCC routinely approves involuntary assignment of licenses where courts had appointed receivers, and it is the receiver's responsibility to comply with 47 U.S.C.S. § 310(d) by seeking FCC's approval of involuntary transfer of a license.

Section 541(a)(1) is broad in scope and includes in the estate all legal or equitable

interests of the debtor in property as of the commencement of the case. *Richardson v. Becker (In re Anderson)*, 19 Mont. B.R. 404, 406-07 (Bankr. D. Mont. 2001), citing *United States v. Whiting Pools, Inc.*, 468 U.S. 198, 205 (1983) (other citations omitted). Section 541(c)(1)(A) provides that a debtor's interest in property becomes property of the estate under § 541(a) notwithstanding any provision in applicable nonbankruptcy law that restricts or conditions transfer of such interest by the debtor.

The value of a government issued license can typically be realized through sale, notwithstanding conditions requiring government approval prior to transfer. *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 254 (3rd Cir. 2001); *In re Nejberger*, 934 F.3d 1300, 1300-02 (3rd Cir. 1991). A FCC-issued radio license was found to constitute property of a debtor's estate under 11 U.S.C. § 541(a) and sold in the course of a bankruptcy auction by the trustee in *Central Arkansas Broadcasting*, 68 F.3d 213, 214 (8th Cir. 1995) (per curiam); *Walsh*, 246 F.3d at 254.

Based on the above-cited case law the Court finds no merit in Debtor's contention that this Court lacks jurisdiction to convert the case to Chapter 7 without FCC approval. The Debtor created the estate when he filed his Chapter 11 petition, and the estate includes the FCC radio license under § 541(a). The UST is aware of the requirement for any trustee appointed to proceed accordingly in the FCC[12], and Stokes' objections can be raised and decided in that forum.

---

[12]The Court inquired of Jensen at the conclusion of the hearing as to what has been done to preserve the FCC license. Jensen advised the Court that a prospective trustee has inquired with the FCC on how to transfer or preserve an FCC license, and that in a bankruptcy context a station can go dark for a limited period of time in non-user status. Stokes stated that the FCC procedure includes an appeal process and he will appeal any transfer.

26

**II.  Conversion.**

Conversion or dismissal is provided for at § 1112(b), which sets forth a nonexclusive list of factors.  *In re Shockley*, 15 Mont. B.R. 114, 116 (Bankr. D. Mont. 1996); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382 (Bankr. E.D. Pa. 1991).  Formerly the analysis involved a two-step process, first to determine whether cause exists to dismiss or convert, and second whether dismissal is in the best interests of creditors and the estate.  *In re BTS, Inc.*, 247 B.R. 301, 308-09 (Bankr. N.D. Okla. 2000) (*quoting In re Superior Siding & Window, Inc.*, 14 F.3d 240, 242 (4th Cir. 1994)); *In re Shockley*, 15 Mont. B.R. at 117 (*quoting Superior Siding*).  Section 1112(b) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and now provides:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.
>
> (2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that –
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections to not apply, within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A) –
>
> (i) for which there exists a reasonable justification for the act or omission; and
>
> (ii) that will be cured within a reasonable period of time fixed by the court.
>
> (3) The Court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the

27

motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance[13] for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

    (4) For purposes of this subsection, the term 'cause; includes –

        (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

        (B) gross mismanagement of the estate;

        (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

        (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

        (E) failure to comply with an order of the court;

        (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

        (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

        (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

        (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

        (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

        (K) failure to pay any fees or charges required under chapter 123 of title 28;

        (L) revocation of an order of confirmation under section 1144;

        (M) inability to effectuate substantial consummation of a confirmed plan;

        (N) material default by the debtor with respect to a confirmed plan;

        (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

---

[13]The time limit ceased to apply when the UST filed two motions to continue the hearing on the motion to convert, both of which were granted.

(P) failure of the debtor to pay any domestic support
obligation that first becomes payable after the date of the
filing of the petition.

The determination under § 1112(b) rests with the sound discretion of the court. *Pioneer*

*Liquidating Corp. v. United States Trustee (In re Consol. Pioneer Mortg. Entities)*, 264 F.3d 803,

806-07 (9th Cir. 2001); *In re Henson*, 289 B.R. 741, 752-53 (Bankr. N.D. Cal. 2003); *In re*

*Shockley*, 15 Mont. B.R. at 116; *In re BTS, Inc.*, 247 B.R. at 309.  The initial burden of proof is

on the moving party.  *In re BTS, Inc.*, 247 B.R. at 303.

The UST is required under 28 U.S.C. § 586(a)(3)(D) to take action to ensure that all

reports, schedules and fees required to be filed by the debtor are properly and timely filed.  The

Debtor's duties as a debtor-in-possession are cross referenced at 11 U.S.C. § 1107(a), §

1106(a)(1), and § 704(a)(8), to require a debtor in Chapter 11 to file periodic reports and

information as the UST requires.  Stokes did not dispute his obligation to file accurate Schedules

and SOFA.

Little more needs to be added to the record above about the condition of Stokes' original

Schedules and SOFA.  Literally millions of dollars of purported assets were omitted from the

Schedules, including lawsuits, vehicles and at least one boat.  Stokes admitted that his Schedules

and SOFA contained numerous errors and omissions, and blames his attorney for the condition of

the original Schedules.  However, Stokes voluntarily selected Duncan as his attorney of record,

and he cannot avoid the consequences of the acts or omissions of his freely-selected attorney.

*Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380,

396-97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *In re Casey*, 193 B.R. 942, 949 (Bankr.

S.D. Cal. 1996).

29

The UST argues that the condition of the original Schedules and SOFA alone is enough to require conversion to Chapter 7.  The Court agrees that the condition of the original Schedules and SOFA is evidence of "cause" under § 1112(b), but finds that additional relevant evidence exists in the record, and amendment of schedules is liberally allowed under F.R.B.P. 1009(a).  *In re Michael*, 163 F.3d 526, 529, 17 Mont. B.R. 192, 198 (9th Cir. 1998) (citing cases).

Of particular concern is Stokes' testimony regarding his signed declarations on Ex 24, which were signed under penalty of perjury, that he reviewed the Schedules and SOFA and that they were true and correct.  His declarations are not truthful.  Stokes testified that he was faxed the signature pages and told to sign them and return them, and that he signed the declaration pages and returned them without reviewing the Schedules and SOFA.  This Court discussed a debtor's responsibility in completing schedules and statements of financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont. 1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith* (*In re Smith* ), 14 Mont. B.R. 228, 232 (Bankr. D. Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont. B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.

> In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's

30

> Schedules and Statements of Affairs. Furthermore, in written arguments filed with
> the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset.
> These flagrant violations of Wolcott's clear duty of honesty and forthrightness in
> the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to
> conceal property.

The above-quoted language about the Debtor's duty to prepare Schedules and SOFA "carefully, completely, and accurately" applies in a Chapter 11 case as much as in Chapter 7 case. For Stokes to sign declarations under penalty of perjury stating that he had reviewed the Schedules and SOFA and that their were true and correct, when he had not reviewed them, is inconsistent with his duty and is further evidence of cause under § 1112(b)(4) to convert.

Stokes amended his Schedules and SOFA, and while they correct many errors and omissions on the original Schedules, Stokes admitted at the hearing that the Montana DOT's claim is not listed on Schedule F, nor is his alleged claim against Judge Curtis. As before, Stokes signed his declarations under penalty of perjury that he had reviewed the amended Schedules and SOFA and that they were true and correct, but they continue to have errors and omissions.

Rezentes testified that the Debtor has not filed any monthly operating reports which satisfy the UST's Guidelines. Rezentes testified that the financial documents which Stokes filed did not satisfy the UST's requirements, and they were unable to analyze his financial condition. Unexcused failure to satisfy timely any filing or reporting requirement established by statute or rule applicable to a Chapter 11 is "cause" under § 1112(b)(4)(F), and failure to provide information reasonably requested by the UST is a specified "cause" under § 1112(b)(4)(G). Stokes' argument that his failure to properly complete paperwork is not grounds to convert him to Chapter 7 is contrary to those express provision of § 1112(b)(4). Debtor's failure to comply with those subsections is established by Rezentes' testimony that he failed to timely file monthly

31

operating reports in conformity with the UST Guidelines, and that failure constitutes additional cause under § 1112(b)(2) and (b)(4).

Rezentes testified that the Debtor has not made payments of the quarterly UST fees due in the amount of $325, to which the Debtor replied at the hearing that the fees were en route. Given that so many of Stokes' representations on sworn declarations, and regarding tax returns and financial data, turned out not to be true, the Court finds that Stokes failed to pay UST fees, which is grounds for conversion or dismissal under § 1112(b)(4)(K).

The evidence of Stokes' failure to file state and federal tax returns is a red flag. This Court has long held that it is not in the public interest to allow debtors who fail to undertake their burdens under the Internal Revenue Code by not filing tax returns, to enjoy the benefits of the United States Bankruptcy Code. The IRS and DOR have filed estimated claims based on the Debtor's failure to file his tax returns. At the hearing the evidence showed that Stokes still had not completed his 2008 Montana tax return. When the Court considers Debtor's failure to file his tax returns with the numerous errors and omissions in his Schedules and SOFA, his failure to file monthly operating reports, failure to pay UST fees, and failure to cooperate with the UST in performing his duties, the Court finds and concludes that overwhelming evidence establishes the "cause" identified under § 1112(b)(2) and (b)(4) that is necessary for conversion to chapter 7.

All of the creditors who responded and appeared, save one, including Gardners, Boone, et al., the DOR, and the IRS, joined in the UST's motion to convert. The only creditor who objected was the Debtor's daughter Elizabeth. The joining creditors rejected the Debtor's contentions that conversion would result in delay and insufficient proceeds from a liquidation sale.

32

The question is what is in the best interest of creditors and the estate. *In re Shockley*, 15 Mont. B.R. at 116. The interest of a single creditor with a large enough claim will suffice under the § 1112(b) test. *In re Staff Investment Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1992); *Goodrich v. Lines*, 284 F.2d 874, 877 (9th Cir. 1960). The Court notes that the only creditor with a large claim who opposes the UST's motion to convert is Stokes' daughter, who as a relative is an insider as defined at 11 U.S.C. § 101(31)(A)(i), and therefore whose vote cannot be taken into account when determining whether a class that is impaired under a plan has accepted the plan. 11 U.S.C. § 1129(a)(10).

In considering the best interest of creditors and the estate, the Court notes the results in the record of Stokes' various litigation, in which several creditors are the opposing parties. Stokes is optimistic in his assessment of his prospects in his appeal of the Gardners' judgment, and his usury claim against Boone, et al., and his claims against DaHood, and in the condemnation case with the City of Kalispell, which the evidence shows has not even reached the stage where Kalispell has made an offer. Stokes is not an attorney, and while he zealously argues his positions, the record of his unsuccessful results in litigation is uniform and speaks for itself. Further, his status as litigant against his creditors is inconsistent with his trustee duties to creditors.

Given those results and the pending appeal and other litigation, and the condition of the Debtor's Schedules and SOFA, this Court finds that the best interests of the creditors and estate clearly are served with conversion to Chapter 7, and appointment of a trustee and qualified and objective counsel to investigate and evaluate the Debtor's assets and lawsuits. A trustee's financial incentive in Chapter 7 promotes a thorough investigation of assets and claims and

33

maximization of the recovery for the estate, and if the trustee determines that a lawsuit or other asset is burdensome or of inconsequential value or benefit to the estate then it may be abandoned to the Debtor under 11 U.S.C. § 554.  Based upon the testimony and exhibits admitted at the hearing, the Court finds that the best interests of the creditors and the estate are served by granting the UST's motion to convert to Chapter 7 and for appointment of a Trustee in Chapter 7 to evaluate and administer the estate.

Section 1112(b)(2) requires that conversion or dismissal not be granted, absent unusual circumstances, if the debtor or other party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within applicable reasonable timeframes; and that there were reasonable justifications for the debtor's act or omission and that the act or omission will be cured within a reasonable period of time.  With respect to the Plan, Ex. 26 is Stokes' "Disclosure Statement and Plan of Reorganization."  It contains no financial information of the Debtor, and proposes to pay creditors from the condemnation proceedings with Kalispell which the evidence shows, based on Harball's testimony, has not commenced or even progressed to the point that Kalispell has made Stokes an offer under Ex. 3.

Stokes testified that he obtained the form for Ex. 26 from a bankruptcy court site. However, the Debtor cannot solicit acceptance of his Plan unless a written disclosure statement is first approved after notice and a hearing as having "adequate information."  11 U.S.C. § 1125(b). "Adequate information" is defined at § 1125(a)(1) as meaning information of a kind and in sufficient detail that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan.  Ex. 26 fails to satisfy the adequate information requirement of § 1125(a)(1) by any measure.  It includes no historical or current financial information, and

34

relies entirely on proceeds from a condemnation proceeding which the evidence shows has not commenced. The case commenced on March 4, 2009, and more than six months later no disclosure statement exists that can be approved, and thus no solicitation for acceptance of a plan can be made. All creditors who have appeared oppose the Debtor's reorganization, except for an insider, and thus Debtor's prospects for obtaining a class of claims to accept his plan from among the several defendants in his litigation are unlikely. The Court finds that the Debtor has failed to establish a reasonable likelihood that a plan will be confirmed within a reasonable period of time under § 1112(b)(2)(A).

Based on the testimony and evidence above of the errors and omissions, the Court finds that Debtor has failed to establish under § 1112(b)(2)(B) that a reasonable justification exists for his acts and omissions regarding his Schedules and SOFA, false declarations under penalty of perjury, failure to provide monthly operating reports in conformity with the UST Guidelines and failure to pay UST fees. The Debtor was given additional time by the UST, and the Court declines to grant the Debtor any further time to cure his acts and omissions under § 1112(b)(2)(B)(ii).

In sum, this Court concludes that the UST has satisfied its burden of proof to show that cause exists to convert to Chapter 7, and that conversion is in the best interests of creditors and the estate.

### III.  Debtor's Motion to Lift Stay.

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion. *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th

Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20

Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d

107, 108-109 (9th Cir. 1995).  Given the decision above granting the UST's motion to convert

the case to Chapter 7, the Court deems it premature to lift the stay to allow the Debtor's appeal of

the Gardners' judgment to proceed in the Montana Supreme Court.  With conversion of this case,

a trustee will be appointed in the Chapter 7 case who must be permitted reasonable time to

evaluate the Debtor's appeal along with the other assets and claims.  Therefore, the Court

exercises its discretion and denies Debtor's motion to lift stay without prejudice at this time.

## CONCLUSIONS OF LAW

1.  This Court has original and exclusive jurisdiction in this bankruptcy case.

2.  The UST's motion to convert the case to Chapter 7 is a core proceeding under 28

U.S.C. § 157(b)(2).

3.  Debtor's motion to lift the stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

4.  The UST established cause to convert the case to Chapter 7 under § 1112(b)(2) & (4)

for Debtor's numerous errors and omissions in his Schedules and Amended Schedules, Debtor's

declaration under penalty of perjury that he had read and reviewed his Schedules when he had

not when he signed them, Debtor's unexcused failure to satisfy timely the UST's reporting

requirements, Debtor's failure to timely provide information reasonably requested by the UST,

Debtor's failure to file monthly operating reports, Debtor's failure to pay quarterly fees to the

UST, and Debtor's failure to file state and federal income tax returns for a period of several

years.

5.  The Debtor failed to establish that a reasonable likelihood exists that a plan will be

36

confirmed within applicable timeframes, and failed to establish that the acts or omissions of the Debtor were reasonably justified and that they will be cured within a reasonable period of time.

6.  Conversion of this case to Chapter 7 is in the best interests of creditors and the estate.

7.  The Court exercises its discretion under § 362(d) and denies Debtor's motion to modify the stay.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above (1) overruling Debtor's objections and denying Debtor's motion to dismiss, granting the UST's motion to convert and converting this case to a case under Chapter 7; and (2) denying Stokes' motion to modify the stay without prejudice against the trustee who will be appointed in the Chapter 7 case.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

37